IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–00884–EWN–KLM


MARICELA CARBAJAL,

     Plaintiff,

v.

LINCOLN BENEFIT LIFE COMPANY,
a Nebraska company,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is an insurance case. Plaintiff Maricela Carbajal alleges Defendant Lincoln Benefit Life Company breached a life insurance contract, and did so in bad faith, by failing to pay benefits after the death of her husband, Miguel Carbajal. Defendant counterclaims for a declaratory judgment that its denial of Plaintiff's insurance claim was proper. This matter comes before the court on "Lincoln Benefit Life Company's Motion for Summary Judgment as to Plaintiff's Second Cause of Action — Bad Faith," filed February 22, 2008, and "Motion to Strike Inadmissible Exhibits Filed with Plaintiff's Response to Lincoln Benefit's Motion for Summary Judgment," filed April 25, 2008. Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

# FACTS

## 1. *Factual Background*

The facts relevant to Defendant's motion for partial summary judgment cannot be determined without reference to its motion to strike, and I accordingly address Defendant's admissibility arguments in the context of presenting the various disputed and undisputed facts of this case.

On October 25, 2002, Mr. Carbajal applied to convert an existing $100,000 term life insurance rider under a life policy he had had with Defendant since 1998 into a $100,000 universal life policy and to increase the death benefit by an additional $400,000 rider. (Lincoln Benefit Life Company's Mem. Br. in Supp. of Mot. for Summ. J. as to Pl.'s Second Cause of Action — Bad Faith [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 1 [filed Feb. 22, 2008]; *admitted at* Pl.'s Resp. to Lincoln Benefit Life Company's Mot. for Summ. J. as to Pl.'s Second Cause of Action — Bad Faith [hereinafter "Pl.'s Resp."], Resp. to Lincoln Benefit's Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 1 [filed Mar. 27, 2008].) Plaintiff contends that such conversion was consistent with a state court's order in a divorce proceedings that Mr. Carbajal provide at least one million dollars worth of life insurance coverage to her, and cites in support of this contention (1) her own second amended complaint and (2) what purports to be a page of a settlement agreement. (*See* Pl.'s Resp., Statement of Additional Disputed Facts [hereafter "SAF"] ¶ 1, Ex. 2 ¶¶ 3–13 [Compl.], Ex. 3 at 2 [Settlement Agreement].)

Defendant moves to strike Plaintiff's complaint and the purported page from the settlement agreement because: (1) an unverified complaint, containing conclusory allegations, is not competent evidence; and (2) the unsigned, uncertified, unauthenticated purported settlement agreement excerpt lacks sufficient foundation.  (Mot. to Strike Inadmissible Exhibits Filed with Pl.'s Resp. to Lincoln Benefit's Mot. for Summ. J. at 6–7 [filed Apr. 25, 2008][hereinafter "Def.'s Strike Br."]; Lincoln Benefit Life Company's Reply in Supp. of Mot. to Strike Inadmissible Exhibits Filed with Pl.'s Resp. to Lincoln Benefit's Mot. for Summ. J. at 4 [filed June 23, 2008] [hereinafter "Def.'s Strike Reply"].)  I find Plaintiff's second amended complaint inadmissible as evidence because it is unverified.  *Cf. Lantec Inc. v. Novell Inc.*, 306 F.3d 1003, 1018 (10th Cir. 2002) ("A district court may treat a verified complaint 'as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e)." [citation omitted]); *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) (A "complaint may . . . be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury." [citation and internal quotation marks omitted]).  I find Plaintiff's purported settlement agreement excerpt inadmissible because Plaintiff has provided no authentication of this document, and has failed to authenticate it in response to Defendant's motion to strike.  *See* Fed. R. Civ. P. 56(e) (2008) (requiring a "sworn or certified copy" of a document to be attached to an affidavit); *Taylor v. Principi*, 141 F. App'x 705, 708 (10th Cir. 2005) (affirming district court's striking of a plaintiff's unauthenticated evidence in a summary judgment brief where the defendant timely objected to such evidence and the plaintiff "did not simply correct the deficiency by way of a supplemental affidavit").  Accordingly, I find no

admissible evidence on record that Mr. Carbajal converted the rider on his existing life insurance policy in response to any state court order.

In his October 2002 conversion application, Mr. Carbajal represented that he earned $48,000 annually and had a net worth of $54,000 earned through his employment as a driver for Allied Building.  (Def.'s Br., SOF ¶ 2; *admitted at* Pl.'s Resp., RSOF ¶ 2.)  He also listed Plaintiff as his primary beneficiary, and represented he had no other life insurance policies in force with any other company.  (*Id.*; *see also id.*, Ex. B at 3 [10/25/02 App.].)  Defendant accepted Mr. Carbajal' application and issued a policy that, according to its terms, would become incontestable if he died after the first two years of the policy's effective date.  (*Id.*, SOF ¶ 3; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 3.)  Explaining this incontestability clause, Defendant's Senior Claims Division Manager states that if Mr. Carbajal died within the first two year of the policy's issuance, Defendant would conduct an investigation to verify the accuracy of various medical and other representations Mr. Carbajal made in applying for the policy.  (*Id.*, Ex. A ¶ 8 [Rakoczy Aff.].)  The policy provided that it would pay insurance benefits upon "proof of death," which was defined as: (1) "[a] certified original copy of the death certificate;" (2) "[a] certified copy of a decree of a court of competent jurisdiction as to the finding of death;" (3) "[a] written statement by a medical doctor who attended the deceased at the time of death;" or (4) "[a]ny other proof satisfactory to the company."  (Pl.'s Resp., SAF ¶ 2; *admitted at* Lincoln Benefit Company's Reply in Supp. of Its Mot. for Summ. J. as to Pl.'s Second Cause of Action — Bad Faith [hereinafter "Def.'s Reply"], Resp. Concerning Pl.'s Statement of Additional Disputed Facts [hereinafter "RSAF"] ¶ 2 [filed Apr. 25, 2008].)

In August 2003, Defendant received a telephone call from the Carbajals' insurance agent, reporting that on July 15, 2003, Mr. Carbajal had died of a heart attack in Mexico.[1] (Def.'s Br., SOF ¶ 4; *admitted at* Pl.'s Resp., RSOF ¶ 4.) Plaintiff claims that, two days after Mr. Carbajal's death, he was buried in the town cemetery in Las Huertas, Mexico, where he was born and raised. (Pl.'s Resp., SAF ¶ 3.) Nonetheless, because the only evidence Plaintiff cites for this fact is her own unverified complaint, I find no admissible evidence so suggesting. (*See id.*; Compl. ¶ 29.) Plaintiff also claims that approximately fifty people attended Mr. Carbajal's funeral in Las Heurtas, but the only evidence she cites as so demonstrating beyond her inadmissible complaint is a series of photographs which appear to show: (1) an individual in a casket; (2) various individuals crying over the casket; and (3) various individuals standing around what appears to be a cemetery and a grave site. (*See* Pl.'s Resp., Ex. 9 [Photographs].) Plaintiff also claims that: (1) Mr. Carbajal's casket was closed during the funeral to avoid trauma to herself and children; (2) Mr. Carbajal's body was not embalmed; and (3) "the family" stated a scent was detectable emanating from the casket. (Pl.'s Resp., SAF ¶ 5.) Nonetheless, the only evidence Plaintiff cites for these facts are her own inadmissible complaint, the series of photographs, and a page of her deposition which she fails to append to her brief. (*See id.*; *see also* Ex. 6 at 2 [Carbajal Dep.].) Accordingly, I find no admissible evidence on record supporting such claims.

---

[1]Plaintiff represents in her complaint that she and Mr. Carbajal divorced in January 2002 but remarried in the spring of 2003. (*See* Pl.'s Second Am. Compl. ¶¶ 6, 11 [filed Jan. 18, 2007] [hereinafter "Compl."].)

On August 11, 2003, Defendant invited a claim from Plaintiff by sending a letter with instructions, forms, and requirements to her insurance agent. (Def.'s Br., SOF ¶ 5; *admitted at* Pl.'s Resp., RSOF ¶ 5.) Amongst the documents to be completed by Plaintiff were: (1) a claim form; (2) an authorization for release of information; and (3) a foreign death questionnaire. (*Id.*) Defendant also requested documents concerning travel details and documentation of Mr. Carbajal's trip. (*Id.*) Defendant advised Plaintiff it would undertake a routine investigation because Mr. Carbajal had died within the two-year contestable period, and that, because the death had occurred outside the United States, an investigation would be conducted to verify the facts concerning the death. (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 6.) Defendant routinely requires verification of deaths in foreign countries because, in its experience, foreign death certificates do not have the same inherent reliability as death certificates issued by state and local governments in the United States. (*Id.*, SOF ¶ 7; *admitted at* Pl.'s Resp., RSOF ¶ 7.)

On October 28, 2003, Defendant received certain claim information from Plaintiff. (*Id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.) Although the parties' proffers are slightly unclear, it appears that such information included: (1) two Mexican death certificates signed by a doctor and issued by Mexico's "Civil Registry" respectively; and (2) the same series of photographs described *supra*. (*See* Pl.'s Resp., SAF ¶¶ 7(a)–(b); *deemed admitted at* Def.'s Reply, RSAF ¶¶ 7.)[2] In a letter acknowledging receipt of this claim, Defendant advised Plaintiff it would conduct

---

[2] Reading this court's practice standards literally, Defendant neither admits nor disputes Plaintiff's own proffered facts, but merely admits or disputes whether such facts are "disputed." (*See* Def.'s Reply at 3–6; Practice Standards — Civil: Special Instructions Concerning Motions for Summary Judgment 6(b) [requiring that the movant "either admit that [the nonmovant's] fact

an investigation because the death occurred in a foreign county, and because Plaintiff's policy was still contestable. (Def.'s Br., SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.)

In November 2003, during the course of its investigation, Defendant learned that several other life insurance companies were also conducting investigations into Mr. Carbajal's death. (*Id.*, SOF ¶ 9; *admitted at* Pl.'s Resp., RSOF ¶ 9.) Defendant had previously been unaware of the other life insurance policies taken out upon Mr. Carbajal. (*Id.*)

Mr. Rakoczy, Defendant's Senior Claims Division Manager, affies that Mr. Carbajal applied for a total of $1.9 million in life insurance coverage from different companies and through different agents between October and December 2002, and failed to disclose he had other outstanding policies or applications in at least three of his applications, despite specific questions so inquiring. (Def.'s Br., Ex. A ¶ 15 [Rakoczy Aff.].) Plaintiff proffers no admissible evidence disputing these facts, but nonetheless purports to deny them based on inadmissible or inapposite evidence. (*See* Pl.'s Resp., RSOF ¶ 11 [purporting to deny these facts based on: (1) the inadmissible complaint; (2) the inadmissible and inapposite settlement agreement excerpt; and (3) Mr. Rakoczy's inapposite testimony that Defendant does not have a material misrepresentation claim].)

In the course of its investigation, Defendant also learned that on June 25, 2003 — approximately three weeks before his alleged death — Mr. Carbajal had applied for another

---

is disputed or supply a *brief* factual explanation for his explanation that the fact is undisputed"].) Accordingly, I deem as admitted those facts which Defendant disputes are disputed, and cite to Plaintiff's underlying evidence for those facts which Defendant admits are disputed.

$500,000 life insurance policy with another company, naming his brother as the primary beneficiary, and representing he had no other life insurance policies in force or other applications pending. (Def.'s Br., SOF ¶¶ 12–13; *admitted at* Pl.'s Resp., RSOF ¶¶ 12–13.)

When Plaintiff filed her claim with Defendant, she disclosed the existence of only one additional $100,000 policy, and not the other policies in force totaling over $2 million dollars. (*Id.*, SOF ¶ 14; *admitted at* Pl.'s Resp., RSOF ¶ 14.) According to Mr. Rakoczy's affidavit, Defendant learned through its investigation that Plaintiff had not completely disclosed the existence of other policies when she filed claims with other insurance companies. (*Id.*, Ex. A ¶ 18 [Rakoczy Aff.].) Plaintiff admits this fact, but cagily responds that "the documents are represented in English and [her] primary language is Spanish." (Pl.'s Resp., RSOF ¶ 15.) Plaintiff cites no admissible evidence pertaining to her language abilities.

In late November 2003, Defendant joined the investigation already underway for other life insurance companies in Mexico being conducted by International Claim Specialists ("ICS") and its investigator, Dan McIntosh. (*See* Def.'s Br., SOF ¶¶ 16–17; *deemed admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 16–17.) Although Mr. Rakoczy testified that Defendant had previously hired Mr. McIntosh to conduct at least one claim investigation in Mexico, Mr. McIntosh acknowledged in his deposition that Defendant had not asked him about his background and experience before hiring him for the Carbajal investigation. (Def.'s Reply, Ex. A–11 at 3–4 [Rakoczy Dep.]; Pl.'s Resp., Ex. 39 at 2 [McIntosh Dep.].) Similarly, Mr. McIntosh testified he (1) had lived in Mexico for twenty years, (2) exclusively spoke Spanish early in his marriage to a Mexican national, and (3) had conducted hundreds of foreign death claim

investigations, including in multiple Spanish-speaking countries, but nonetheless admitted he was not fluent in Spanish. (Def.'s Reply, Ex. A-12 at 3–4, 7, 12 [McIntosh Dep.]; Pl.'s Resp., Ex. 8 at 4 [McIntosh Dep.].) As Mr. McIntosh testified:

> As far as me conducting an investigation in Mexico and talking with different people and being able to get to the truth on different circumstances and whether or not the registrar's office has a document that's registered, talking with different family members and getting information from them with my Spanish skills, my limited Spanish skills, which are not fluent, yes, I can conduct an investigation, and I have, in all of the Mexican states, every country in South America, every country in Central America. I go to the Philippines. I don't speak Tangali. I go to Japan. I don't speak Japanese. But I'm able to conduct an investigation through an interpreter in those locations. My Spanish skills are such that I can get information and be able to do a very good investigation.

(Def.'s Reply, Ex. A–12 at 12 [McIntosh Dep.].)

Plaintiff contends that, at some point during the course of his investigation, Mr. McIntosh was assisted in some fashion by an individual named Lorenzo De Anda, whom she claims was a Mexican attorney. (*See* Pl.'s Resp., SAF ¶ 15.) Although most of the evidence Plaintiff cites for this assertion — her complaint, and what purport to be emails between Mr. McIntosh and an individual in a different insurance company — is inadmissible for reasons discussed both above (with respect to the unverified complaint) and below (with respect to emails between Mr. McIntosh and an individual in a different insurance company), one document to which Defendant has not objected and which arguably buttress this contention appears to be a ICS invoice to Defendant dated December 1, 2004, listing Mr. De Anda as a "source." (*Id.*, Ex. 22 at 2–3 [McIntosh Emails], Ex. 23 at 2 [12/1/04 Invoice].)

Pursuant to its joint investigative efforts, Defendant exchanged application, policy, and certain claim information with the other insurance companies. (*See, e.g.*, Pl.'s Resp., SAF ¶ 13; *admitted at* Def.'s Reply, RSAF ¶ 13.) From December 2003 to April 2005, Mr. McIntosh provided a series of investigative reports to Defendant, based largely on his interview of witnesses in Mexico. (*Id.*, SOF ¶¶ 18–19; *admitted at* Pl.'s Resp., RSOF ¶¶ 18–19.) While the parties dispute the truth of what was represented in these reports, they agree that following information was conveyed from Mr. McIntosh to Defendant. (*See id.*, SOF ¶ 19; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 19.)

(1)     Mr. McIntosh interviewed the owner of a funeral home for which Plaintiff had provided a receipt for services. This owner told Mr. McIntosh that Plaintiff's transaction was quite unusual because, on July 15, 2003, a man and a woman came into his funeral home, purchased the cheapest metal casket available, placed it in the back of a truck, and returned with the casket one hour later to place it in a room for viewing. The owner never saw a body in the casket during viewing. In addition, the owner reported that although the funeral home received payment to transport the casket for burial, the man and woman declined transportation services for the four-hour drive to the cemetery in Mr. Carbajal's home town. Instead, Plaintiff's companions loaded the casket into a truck in the early morning of July 16, 2003.

(2)     In addition to purchasing a casket from the funeral home, Plaintiff obtained a cremation permit on July 16, 2003, and signed a receipt for cremated remains on that same date.

(3)     The two public death certificates Mr. McIntosh located bear two different addresses for the location(s) of Mr. Carbajal's death.

(4)     Mr. McIntosh was unable to verify the alleged death or any other information with two people whose names appear on records in Mexico as witnesses to Mr. Carbajal's heart attack and death. Specifically, Mr. McIntosh found that the address listed on a declaration in the Mexican public registry bearing the name of Adalberto Garza Larios was false, and

Mr. Larios has never been found.  Mr. McIntosh located the second witness, Alejandra Basulto, at whose home Mr. Carbajal allegedly died, but Ms. Basulto refused to be interviewed and avoided being contacted on multiple occasions.  Ms. Basulto's former employer nonetheless told Mr. McIntosh that although Ms. Basulto was at work on July 15, 2003, she never mentioned someone had died at her house.  According to this employer, Ms. Basulto told her that her boyfriend asked her to lie and say that someone had died at her home on July 15, 2003, so that person could collect insurance money.

(5)     Dr. Avila-Mora, the Mexican doctor whose signature appears on one death certificate told Mr. McIntosh a woman claiming to be Mr. Carbajal's spouse told him that Mr. Carbajal had a two-year history of arterial hypertension.

(6)     Socorro Morales, the wife of the mayor of the town in which Mr. Carbajal was reportedly buried, told Mr. McIntosh that, in October 2003, she saw that Mr. Carbajal's casket had been exhumed and was lying next to the open burial site.  She viewed the open casket, and saw dirt inside and a bag of cement lying next to the open hole, but no remains.

(*Id.*)

While Plaintiff admits the preceding information was conveyed from Mr. McIntosh to

Defendant, she proffers evidence to both dispute and elaborate upon these alleged facts.

Defendant likewise proffers additional evidence to show the above information is true.  I discuss

such proffers in turn, before returning to the narrative of Defendant's claim investigation.

### a.     Burial Versus Cremation of Mr. Carbajal's Remains

Public records in Mexico include a receipt for ashes signed by Plaintiff.  (Def.'s Br., SOF

¶ 40; *admitted at* Pl.'s Resp., ROSF ¶ 40.)  Nonetheless, Plaintiff stated in her deposition that

Mr. Carbajal was buried in Las Huertas.  (*Id.*, SOF ¶ 41; *admitted at* Pl.'s Resp., ROSF ¶ 41.)

The casket was not opened during the funeral in Las Huertas.  (*Id.*, SOF ¶ 42; *admitted at* Pl.'s

Resp., ROSF ¶ 42.)

### b.     *Location of Mr. Carbajal's Death*

Dr. Avila-Mora admitted in his deposition that he visited the alleged site listed as one of the locations for Mr. Carbajal's death — 158 Moctezuma, Octlan — and that there was not any building on that street bearing such a number.  (Def.'s Br., Ex. A-5 at 11 [Avila-Mora Dep.].) Dr. Avila-Mora testified that, as a result, any suggestion on the public ministry form that this was the location of Mr. Carbajal's death was erroneous.  (*Id.*)

### c.     *Witnesses to Mr. Carbajal's Death*

Plaintiff claims Mr. McIntosh threatened Ms. Basulto.  (Pl.'s Resp., SAF ¶ 19.) Nonetheless, Plaintiff's only evidence so relating is her own inadmissible complaint and her allusion to a video tape allegedly showing Ms. Basulto so claiming.  (*See id.*)  Because Plaintiff did not proffer this videotape despite stating it was "available for the Court's review," and because the complaint is inadmissible, I find no competent evidence on record suggesting that Mr. McIntosh threatened Ms. Basulto.  (*Id.*)

Plaintiff also suggests Mr. McIntosh did not want to interview Ms. Basulto at her home because he felt he needed state police to apply pressure.  (*Id.*, SAF ¶ 18.)  Nonetheless, the only evidence she cites for this fact are handwritten notes on a document entitled "Phone Log" that arguably so relate.  (*Id.*, SAF ¶ 18, Ex. 28 at 2 [Phone Log].)  Defendant objects that this document is unauthenticated and is hearsay.  (Def.'s Strike Br. at 12.)  In response, Plaintiff does not discuss this document specifically, but includes it in a section of her response to Defendant's motion to strike making a blanket argument that this evidence — along with other evidence discussed *infra*, and the above-referenced emails between Mr. McIntosh and an employee of

another insurance company regarding Mr. De Anda — falls within the business records exception to the rule against hearsay because it ended up in the Defendant's files through Defendant's document exchanges with other insurance companies and/or Plaintiff's initial disclosure of evidence she had obtained through litigation with other insurance companies. (Pl.'s Resp. to Def.'s Mot. to Strike Inadmissible Exhibits Filed with Pl.'s Resp. to Lincoln Benefit's Mot. for Summ. J. at 10–12 [filed June 6, 2008] [hereinafter "Pl.'s Strike Resp."].)

I find Plaintiff's proffered "Phone Log" inadmissible because Plaintiff has provided no authentication of this document. *See* Fed. R. Civ. P. 56(e) (2008); *Taylor*, 141 F. App'x at 708. I also find that, contrary to Plaintiff's only argument for admissibility, this evidence constitutes inadmissible hearsay because Plaintiff has adduced no foundational evidence suggesting it satisfies any of the requirements for the business records exception to the rule against hearsay. *See* Fed. R. Evid. 803(6) (2008); *U.S. v. Ary*, 518 F.3d 775, 786 (10th Cir. 2008) (stating that to satisfy Rule 803(6), business records must: "(1) have been prepared in the normal course of business; (2) have been made at or near the time of the events recorded; (3) be based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) indicate the sources, methods and circumstances by which the record was made were trustworthy."). Finally, I find Plaintiff's proffered cases suggesting that courts may choose to take judicial notice of hearsay evidence bearing particular indicia of reliability — such as bank statements, and VIN numbers on invoices for car sales — inapposite and unpersuasive on the facts of this case, which involve extensive allegation of fraud. *See Fed. Deposit. Ins. Co. v. Staudinger*, 797 F.3d 908, 910 (10th Cir. 1986); *United State v. Hines*, 564

F.2d 925, 927 (10th Cir. 1977).  Accordingly, I find no admissible evidence on record suggesting

Mr. McIntosh did not want to interview Ms. Basculo in her house because he wanted to apply

pressure through state police.

### c.     Dr. Avila-Mora's Certification of Mr. Carbajal's Death

Plaintiff claims that, during the course of Mr. McIntosh's investigation during the spring

of 2004, Mr. De Anda attempted to bribe and threaten Dr. Avila-Mora in order to get him to sign

an affidavit stating the death certificate he signed was fake.  (Pl.'s Resp., SAF ¶¶ 16–17.)  While

I find that most of the evidence Plaintiff cites for this assertion — namely, her complaint, and

what appears to be email correspondence between two individuals in another insurance company

— inadmissible for reasons discussed above (namely, lack of verification of the complaint, lack

of authentication for the emails, and hearsay in the emails) the doctor's deposition testimony

supports this claim.  (*See* Pl.'s Resp., Ex. 24 [5/25/04 Email Powerpoint], Ex. 25 [5/25/04

Email], Ex. 26 at 2–3 [Avila-Mora Dep.].)  Specifically, the doctor testifies that Mr. De Anda

offered to provide travel arrangements, money, and "a series of gifts" if he changed the death

certificate, and Mr. De Anda insinuated the doctor's failure do so could lead to further

investigation that could affect his reputation.  (*Id.*, Ex. 26 at 2–3 [Avila-Mora Dep.].)  Plaintiff

also proffers what it claims to be a "translated itemized bill from [Mr.] De Anda" to unspecified

persons showing he billed nine hours for his efforts in the investigation.  (*Id.*, Ex. 29 [De Anda

Bill].)  I find this bill inadmissible because it is unauthenticated and contains hearsay.

Plaintiff also asserts Mr. McIntosh indicated to another insurance company that he had a

Mexican governmental contact who could put a hold on the doctor's visa for a planned trip to the

United States. (Pl.'s Resp., SAF ¶ 17, Ex. 27 [2/10/04 Letter].) Nonetheless, the only evidence Plaintiff cites for this fact is a letter from Mr. McIntosh to another insurance company, and I find this letter inadmissible for lack of authentication and potentially as hearsay depending upon the unclear purpose for which it is offered. *See* Fed. R. Civ. P. 56(e) (2008); *Taylor*, 141 F. App'x at 708; Fed. R. Evid. 802 (2008).

During a February 2008 deposition, Dr. Avila-Mora confirmed that the cause of death information he wrote on the death certificate came from information Plaintiff provided. (Def.'s Br., SOF ¶ 33; *admitted at* Pl.'s Resp., RSOF ¶ 33.) The doctor did not perform medical tests or an autopsy, and signed the death certificate certifying death by heart attack and arterial hypertension based on Plaintiff's information. (*Id.*, SOF ¶ 34; *admitted at* Pl.'s Resp., RSOF ¶ 34.) In her deposition and in claim forms, Plaintiff stated Mr. Carbajal had no history of hypertension or heart disease, that his health was in "perfect condition," that he took no medication for hypertension, and that she does not think she ever told Dr. Avila-Mora any contrary information. (*Id.*, SOF ¶ 35; *admitted at* Pl.'s Resp., RSOF ¶ 35.) Mr. Carbajal's medical records show no history of heart problems or hypertension, and none was disclosed on the applications for insurance where such information was required. (*Id.*, SOF ¶ 36; *admitted at* Pl.'s Resp., RSOF ¶ 36.)

Dr. Avila-Mora stated he did not know the person he certified as dead, the spouse, the family, or anyone else at the house where this person allegedly died. (*Id.*, SOF ¶ 37; *admitted at* Pl.'s Resp., RSOF ¶ 37.) The doctor never saw any identification from anyone or any identification proving the body was that of Mr. Carbajal. (*Id.*)

### d. **Exhumation of Mr. Carbajal's Grave**

The parties agree that Mr. McIntosh visited Mr. Carbajal's alleged grave site in the fall of 2003. (Pl.'s Resp., SAF ¶ 26; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 26.) Plaintiff additionally contends, on the basis of evidence to which Defendant raises no direct admissibility objection, that "[i]nformation contained in the reports of [Mr.] McIntosh show that [Mr.] Carbajal's grave was robbed on October 7, 2003, three days after Mr. McIntosh was documented as being in Las Huertas." (*Id.*, SAF ¶ 26.) Despite this allegation, the underlying evidence Plaintiff cites for these facts are: (1) Ms. Morales's statement to Mr. McIntosh indicating she saw the open grave in early October with an empty casket and a bag of cement lying nearby; and (2) Comisario Asunsion Mercardo's statement to Mr. McIntosh that, on October 7, 2003, he received a phone call from his wife, Ms. Morales, informing him that Mr. Carbajal's grave had been dug up and that the casket was placed next to it and near bags of cement and another building material. (*Id.*, Ex. 33 at 2 [Morales Interview], Ex. 34 at 2 [Mercardo Interview].)

Plaintiff also asserts two other insurance company investigators reported to insurance companies that "people associated with an unnamed insurance company robbed the grave." (*Id.*, SOF ¶ 27.) Nonetheless, I find the two exhibits Plaintiff cites for these propositions — documents purporting to be reports from other investigators to other insurance companies — inadmissible on the authenticity and hearsay grounds discussed above. (*See id.*, Ex. 35 [Goodrich Report], Ex. 36 [Herranz Report].) In addition, upon review of these documents, I find they contain nothing more than inadmissible speculation and hearsay within hearsay. (*See id.*)

Having discussed the parties' proffered evidence probative of the truth or falsity of the information Mr. McIntosh conveyed to Defendant during the course of his investigation, I now return to the narrative of Defendant's claim investigation.

In October 2004, after denying Plaintiff's claim based on Mr. McIntosh's investigation, Defendant proposed to Plaintiff's counsel that an exhumation of Mr. Carbajal's grave would be a means of providing proof as to whether he was dead, and indicated it would pay the policy proceeds if DNA testing revealed any remains to belong to Mr. Carbajal. (Def.'s Br., SOF ¶¶ 23–24; *admitted at* Pl.'s Resp., RSOF ¶¶ 23–24.) In November 2004, Plaintiff agreed through her counsel that an exhumation was appropriate, and stated she expected to be paid Mr. Carbajal's life insurance proceeds if the tests revealed Mr. Carbajal to be dead. (*Id.*, SOF ¶ 25; *admitted at* Pl.'s Resp., RSOF ¶ 25.) Plaintiff's counsel represented that his client would "cooperate in whatever is necessary to obtain the Mexican government's permission to legally and promptly exhume the casket to verify the death of [Mr.] Carbajal." (Def.'s Br., Ex. A-3 at 2 [11/11/04 Letter].)

In May 2005, Plaintiff's counsel sent a letter to Defendant's counsel stating: "We are still willing to participate in the [exhumation process] and encourage that it proceed as rapidly as possible." (Pl.'s Resp., Ex. 30 at 2 [5/6/05 Letter].) In July 2005, Defendant stated in a letter to other insurance companies that: "We are working with Counsel both in the United States and Mexico to accomplish [the exhumation], and we hope to file a request with Mexican authorities perhaps as early as next month." (*Id.*, Ex. 31 at 2 [4/19/05 Letter].) In May 2006, Plaintiff filed the instant action. (*See* Compl. and Jury Demand [filed May 11, 2006].)

Explaining Defendant's exhumation efforts, Mr. Rokoczy affies that: (1) Defendant obtained representation through referrals to Mexican attorneys; (2) Defendant used several lawyers for this process, eventually obtaining a lawyer near the alleged burial site; and (3) "[o]btaining the requisite approval from Mexican authorities for an exhumation was not easily or quickly accomplished." (Def.'s Br., Ex. A ¶ 27 [Rakoczy Aff.].) In November 2006, Defendant represented to Plaintiff and this court that it had filed the request for the exhumation of the grave site in the spring of 2006. (Pl.'s Resp., SAF ¶ 23; *admitted at* Def.'s Reply, RSAF ¶ 23.) Defendant's Mexican counsel for the purpose of seeking an exhumation testified in his deposition that he prepared a petition for exhumation of the body around February 2006, and handed it to a federal district attorney in Mexico for review, but that it was not stamped or formally filed at that time. (Pl.'s Strike Resp., Ex. 2 at 3 [Ramirez Dep.].) This counsel additionally testified that, according to custom in Mexico, prior to filing a formal complaint, a lawyer gets together with the prosecutor to informally discuss the matter. (Lincoln Benefit Life Co.'s Reply in Supp. of Mot. to Strike Inadmissible Exhibits Filed with Pl.'s Resp. to Lincoln Benefit's Mot. for Summ. J. [hereinafter "Def.'s Strike Reply"], Ex. A-15 at 9 [Ramirez Dep.] [filed June 23, 2008].)

In September and November 2006, Plaintiff's counsel collected additional statements which Plaintiff claims proves Mr. Carbajal's death. First, identically worded affidavits of Plaintiff's two children relate that these children saw their father dead on July 15, 2003, both at the home in which he supposedly died, and at the funeral home. (Pl.'s Resp., Ex. 13 ¶¶ 5–8 [V. Carbajal Aff.], Ex. 14 ¶¶ 5–8 [A. Carbajal Aff.].) These affidavits also both state: "I was

harassed by people in Mexico who accused me and my mom of lying about my dad's death."
(*Id.*, Ex. 13 ¶ 12 [V. Carbajal Aff.], Ex. 14 ¶ 12 [A. Carbajal Aff.].) Plaintiff alleges similar harassment. (*Id.*, Ex. 37 at 2 [Carbajal Dep.] [claiming Mr. McIntosh told her "[she] could . . . [lose] her girls and go to jail"].) Second, Plaintiff proffers what purports to be a translated transcript of an interview between Plaintiff's counsel and Dr. Avila-Mora further buttressing the claim that the doctor certified Mr. Carbajal's death. (*See* Pl.'s Resp., SAF ¶ 7(e), Ex. 15 [11/13/06 Interview].) Defendant objects that this alleged transcript is not certified, the statement is not sworn to, the translation is not certified, and the statement contains inadmissible hearsay. (Def.'s Strike Br. at 7.) Plaintiff does not substantively respond to these arguments. (*See* Pl.'s Strike Resp. at 8.) I find this document inadmissible because it is neither sworn to nor certified. *See* Fed. R. Civ. P. 56(e) (2008) (requiring a "sworn or certified copy" of a document to be attached to an affidavit); *see also Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.3d 157, 161 (7th Cir. 1963) ("[A]n uncertified copy of testimony is inadmissible in a summary judgment proceeding."). Finally, Plaintiff proffers what purports to be a translated statement of a worker at the funeral home at which Plaintiff bought the casket stating he saw a body inside the casket. (Pl.'s Resp., SAF 7(f), Ex. 16 at 2 [9/3/06 Statement].) I find this statement inadmissible because it is not a sworn affidavit and is unauthenticated. *See* Fed. R. Civ. P. 56(e) (2008); *Principi*, 141 F. App'x at 708.

On October 25, 2006, another insurance company in a separate case applied for the appointment of a special discovery master to assist in the process of exhumation. (Def.'s Br., SOF ¶ 27; *admitted at* Pl.'s Resp., RSOF ¶ 27.) On December 6, 2006, Magistrate Judge

Michael E. Hegarty appointed Stanley Pimentel as special discovery master for this purpose, citing Defendant's difficulties in obtaining Mexican authority for the exhumation and referencing Mr. Pimentel's unique qualifications for the job. (*Id.*, SOF ¶ 29; *admitted at* Pl.'s Resp., RSOF ¶ 29.) On December 18, 2006, Defendant moved for the appointment of Mr. Pimentel as special discovery master in this case, and on February 6, 2007, I granted this motion. (*Id.*, SOF ¶ 30; *admitted at* Pl.'s Resp., RSOF ¶ 30.)

On August 24, 2007, the exhumation of Mr. Carbajal's gravesite in Las Huertas was conducted under the supervision of the special discovery master, facilitated by Mexican counsel obtained by the master and his other contacts in Mexico. (*Id.*, SOF ¶ 31; *admitted at* Pl.'s Resp., RSOF ¶ 31.) Plaintiff's counsel, representatives of other insurance companies, a Mexican assistant attorney general, forensic specialists, and Mexican health and law enforcement personnel were present. (*Id.*) The special master's report recounts the findings:

> Once the [Public Minister] authorized the exhumation to commence, [the special master's Mexican counsel]'s personnel . . . began digging. After about two hours of digging to a depth of almost [seven] feet, the grave belonging to [Mr. Carbajal] was found empty. No coffin or body — just dirt. [The forensic pathologist] found several shards of glass which he believed could be from the viewing window of a coffin. He also found some pieces of aluminum foil and other materials which may have come from a coffin, but these would have to be examined by forensic personnel. He presented these materials to . . . forensic personnel. When asked if DNA samples could be taken from the soil from the excavated gravesite, [the forensic pathologist] responded that it would be impossible to examine the soil with any certainty since it contained too many contaminants from outside sources.

(Pl.'s Resp., Ex. 5 at 4 [Pimentel Report].) On January 16, 2008, Defendant confirmed its prior denial of Plaintiff's claim based on the results of the exhumation. (Def.'s Br., SOF ¶ 45;

*admitted at* Pl.'s Resp., RSOF ¶ 45.)  Plaintiff proffers an expert report expressing the opinion

that Defendant's failure to pay Plaintiff's claim constitutes bad faith.  (*See* Pl.'s Resp., Ex. 38

[Allen Report].)

## 2.      *Procedural History*

On May 11, 2006, Plaintiff filed a complaint in this court, alleging breach of insurance

contract and bad faith.  (Compl. and Jury Demand [filed May 11, 2006].)  On November 9, 2006,

Plaintiff moved for partial summary judgment "on the issue of the death of [Mr.] Carbajal and

the contractual benefits that are due and owing resulting from that death."  (Mot. for Partial

Summ. J. [filed Nov. 9, 2006].)  On July 31, 2007, I denied this motion.  (Order and Mem. of

Decision [filed July 31, 2007].)

On January 18, 2007, Plaintiff filed a second amended complaint, again alleging breach

of insurance contract and bad faith.  (Compl.)  On January 29, 2007, Defendant answered, and

counterclaimed for a declaratory judgment that its denial of Plaintiff's claim was proper.

(Answer of Def. Lincoln Benefit Life Co. to Pl.'s Second Am. Compl. and Jury Demand, and

Counterclaim [filed Jan. 29, 2007].)

On February 22, 2008, Defendant moved for partial summary as to Plaintiff's bad faith

claim only, arguing the undisputed facts establish it had a reasonable basis for denying Plaintiff's

claim.  (Def.'s Br.)  On March 27, 2008, Plaintiff responded.  (Pl.'s Resp.)  On April 25, 2008,

Defendant replied.  (Def.'s Reply.)

On April 25, 2008, Defendant moved to strike multiple exhibits attached to Plaintiff's

response to Defendant's motion for partial summary judgment.  (Def.'s Strike Br.)  On June 6,

2008, Plaintiff responded.  (Pl.'s Strike Resp.)  On June 23, 2008, Defendant replied.  (Def.'s Strike Reply.)

## ANALYSIS

### 1.     *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467,

1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.    *Evaluation*

Under Colorado law, an insurance contract imposes a "quasi-fiduciary" relationship between the insurer and the insured, giving rise to "a separate action in tort when the insurer breaches its duty of good faith and fair dealing." *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004). To prevail on a tortious breach of contract claim, an insured "must establish that when denying or delaying a claim, the insurer acted: (1) unreasonably and (2) with knowledge of or reckless disregard of its unreasonableness." *TAF, L.L.C. v. Hartford Fire Ins. Co.*, 549 F. Supp. 1282, 1289 (D. Colo. 2008) (citations omitted). "[T]he reasonableness of an insurer's conduct is evaluated under the circumstances that existed at the time," and a bad faith breach of insurance contract claim "encompasses the entire course of conduct and is cumulative." *Anderson v. State Farm Mut. Auto. Ins. Co.*, 416 F.3d 1143, 1147–48 (10th Cir. 2005); *Pham v. State Farm Mut. Auto. Ins. Co.*, 70 P.3d 567, 572 (Colo. Ct. App. 2003). "It is the insured's burden to establish the insurer's knowledge or reckless disregard of the fact that a valid claim has been submitted." *Pham*, 70 P.3d at 572 (citation omitted).

Although "[t]he reasonableness of an insurer's conduct is measured objectively based on industry standards," Colorado courts have held that expert testimony is not required to establish the requisite standard of care when this standard "does not require specialized or technical knowledge," or where it is established by legislative enactment. *Allen*, 102 P.3d at 343 (citations

-23-

omitted).  As relevant to the instant case, Colorado statutes define unfair insurance claim settlement practices to include "not attempting in good faith to effectuate prompt, fair, and equitable settlement of claims in which liability has become reasonably clear," and the Colorado Supreme Court has held that "[t]he reasonableness of an insurer's investigation into the underlying events of an . . . insurance claim is not a technical question and does not require additional professional training beyond the knowledge of the average juror."  Colo. Rev. Stat. § 10–3–1104(h)(1)(h)(VI) (2008); *Allen*, 102 P.3d at 343–45 (internal quotation marks and citations omitted).

Defendant argues there is no triable issue of fact as to whether it denied or delayed Plaintiff's insurance claim in bad faith.  (*See* Def.'s Br.)  Plaintiff responds that a triable issue of fact as to Defendant's bad faith is demonstrated by: (1) its hiring of Mr. McIntosh; (2) Mr. McIntosh's alleged robbing of Mr. Carbajal's grave; (3) Mr. McIntosh and Mr. De Anda's alleged intimidation of herself, her children, and various witnesses; (4) its refusal to pay her claim in light of the evidence suggesting Mr. Carbajal is deceased; and (5) its delay in exhuming Mr. Carbajal's grave.  (*See* Pl.'s Br. at 3, 18–23.)  I assess each of Plaintiff's contentions in turn to determine whether individually or cumulatively they demonstrate a triable issue of fact as to her bad faith breach of insurance contract claim.

### a.      *Defendant's Hiring of Mr. McIntosh*

Plaintiff first argues that Defendant's bad faith denial or delay of her claim may be demonstrated through its hiring of Mr. McIntosh "without checking whether he was fluent in the local language to investigate a foreign death claim."  (Pl.'s Resp. at 21.)  Defendant responds

that this dispute constitutes a "sham" issue of fact. (Def.'s Reply at 15–17.) For the following reasons, I agree with Defendant.

Despite arguing in just two sentences that Defendant's hiring of Mr. McIntosh raises a triable issue of fact as to Defendant's bad faith, Plaintiff fails to locate this contention within the bad faith law cited *supra*. (*See* Pl.'s Resp. at 19, 21.) While I agree that a disputed issue of fact exists as to Mr. McIntosh's Spanish-speaking skills, I disagree that this dispute demonstrates a triable issue of fact as to whether in "denying or delaying [Plaintiff's] claim, [Defendant] acted: (1) unreasonably and (2) with knowledge of or reckless disregard of its unreasonableness." *TAF, L.L.C.*, 549 F. Supp. at 1289. First, Plaintiff has adduced no evidence suggesting Mr. McIntosh's alleged Spanish-language deficiency had anything to do with Defendant's decision to deny or delay coverage. For instance, Plaintiff has adduced no evidence that Mr. McIntosh erred in reporting the statements of any witnesses to Defendant, or that he erred in translating any documents he received from Mexican public records. Because Plaintiff cannot prove Mr. McIntosh's alleged Spanish-language deficiency had any effect upon Defendant's decisions to deny or delay coverage, it follows perforce that she cannot prove Defendant acted unreasonably in reaching any such decisions as a result of its decision to hire Mr. McIntosh. Second, even assuming Mr. McIntosh's alleged deficiency somehow contributed to an erroneous decision on Plaintiff's claim, or that Defendant acted unreasonably by hiring Mr. McIntosh irrespective of the accuracy of his reports, Plaintiff has adduced no evidence that Defendant made such a decision with knowledge of, or reckless disregard for, its unreasonableness. Specifically, no evidence suggests Defendant knew it was acting unreasonably in hiring Mr. McIntosh, and the

only evidence probative of Mr. McIntosh's investigative abilities — from which a jury could draw inferences as to Defendant's scienter in hiring him — actually militates against a finding that Defendant acted with reckless disregard of the unreasonableness of hiring Mr. McIntosh. Mr. Rakoczy testified Defendant had hired Mr. McIntosh to investigate a death claim in Mexico on at least one previous occasion, and Mr. McIntosh testified he had successfully conducted hundreds of such investigations in multiple foreign countries, including those in which he had no native language ability.  (Def.'s Reply, Ex. A–11 at 3–4 [Rakoczy Dep.], Ex. A–12 at 12 [McIntosh Dep.].)  By contrast, Plaintiff has cited no evidence suggesting Mr. McIntosh's alleged foreign language deficiencies negatively affected his ability to conduct foreign death investigations in Mexico or elsewhere, nor has she cited any evidence suggesting Defendant should have been aware of this fact.  Accordingly, I find no triable issue of fact as to whether Defendant recklessly disregarded the unreasonableness of hiring Mr. McIntosh in light of his alleged Spanish-language deficiency.

### b.    Mr. McIntosh's Alleged Robbing of Mr. Carbajal's Grave

Plaintiff next argues a reasonable jury could infer from the evidence that Mr. McIntosh robbed Mr. Carbajal's grave, and consequently conclude Defendant denied Plaintiff's claim in bad faith.  (*See* Pl.'s Resp. at 3, 20.)  Defendant disputes that a reasonable jury could conclude Mr. McIntosh robbed Mr. Carbajal's grave.  (Def.'s Reply at 13–14.)  For the following reasons, I again agree with Defendant.

As determined above, Plaintiff's only potentially admissible evidence purporting to show Mr. McIntosh robbed Mr. Carbajal's grave is: (1) the undisputed fact that Mr. McIntosh visited

Mr. Carbajal's alleged grave site in the fall of 2003; (2) Ms. Morales's statement to Mr. McIntosh that she saw the open grave in early October 2003, with the casket and a bag of cement lying nearby; and (3) Comisario Mercardo's statement to Mr. McIntosh that, on October 7, 2003, he received a phone call from his wife, Ms. Morales, informing him that Mr. Carbajal's grave had been dug up and that the casket was sitting next to the grave near bags of cement and another building material. (*Id.*, Ex. 33 at 2 [Morales Interview], Ex. 34 at 2 [Mercardo Interview].) Defendant fails to directly object to the admissibility of Mr. McIntosh's reports containing Ms. Morales's and Comisario Mercado's statements, instead arguing that all references to grave robbery — including, presumably, all underlying evidence from which these references purport to derive — should be stricken from Plaintiff's brief for her failure to cite any evidence in response to an interrogatory question asking her to identify all facts on which her claims of grave robbery rest. (*See* Def.'s Strike Br. at 4–5.) Nonetheless, Defendant cites no law suggesting that an incomplete interrogatory response regarding the factual basis of a claim precludes later admission of relevant evidence supporting such a claim, and I accordingly decline to strike all of Plaintiff's references to grave robbery on such an unusual ground. Instead, I *sua sponte* find Mr. McIntosh's two reports inadmissible for Plaintiff's failure to authenticate these reports, and because Ms. Morales's and Comisario Mercardo's statements about the exhumed grave constitute inadmissible hearsay for which Plaintiff has proposed no exception and of which I am aware of none. *See World of Sleep, Inc.*, 756 F.2d at 1474 (stating court may only consider admissible evidence when ruling on a summary judgment motion). Because the only remaining evidence allegedly relevant to grave robbery is the undisputed fact that Mr. McIntosh

visited Mr. Carbajal's grave site in the fall of 2003, I find no triable issue of fact as to whether this grave was ever disturbed, much less whether it was robbed.

Alternatively, even assuming Ms. Morales's and Comisario Mercado's statements in Mr. McIntosh's reports were admissible, or assuming Plaintiff could proffer live or other admissible evidence from these declarants stating that they saw Mr. Carbajal's grave disturbed a few days after Mr. McIntosh's visit, I find such evidence insufficient to raise a triable issue of fact as to whether Mr. McIntosh robbed Mr. Carbajal's grave absent evidence that: (1) Mr. McIntosh had any motive to rob this grave; or (2) Mr. Carbajal's body was ever located in this grave. Finally, even were I to assume that Ms. Morales's and Comisario Mercado's statements were admissible, and that a reasonable jury could infer therefrom that Mr. McIntosh robbed Mr. Carbajal's grave, Plaintiff has proffered no evidence that Defendant either knew about or recklessly disregarded the possibility of this grave robbery. Accordingly, at a minimum, I find Plaintiff cannot prove Defendant acted "with knowledge of or reckless disregard of its unreasonableness" in denying or delaying Plaintiff's claim following Mr. McIntosh's alleged grave robbery. *TAF, L.L.C.*, 549 F. Supp. at 1289.

     ***c.     Mr. McIntosh's and Mr. De Anda's Alleged Intimidation of Plaintiff, Her Children, and Various Other Witnesses***

Plaintiff next claims Defendant's bad faith may be demonstrated through Mr. McIntosh's and Mr. De Anda's harassment of herself, her children, Dr. Avila-Mora, and Ms. Basulto. (Pl.'s Resp. at 18, 20, 22–23.) For the following reasons, I disagree.

First, as determined above, Plaintiff has proffered no admissible evidence that Mr. McIntosh threatened Ms. Basulto, and I accordingly decline to consider this theory. Second, with respect to herself and her children, Plaintiff proffers her children's two identical affidavits each reciting: "I was harassed by people in Mexico who accused me and my mom of lying about my dad's death," and her own deposition testimony claiming Mr. McIntosh told her she "could . . . lose [her] girls and go to jail" if she did not renounce her claim. (Pl.'s Resp., Ex. 13 ¶ 12 [V. Carbajal Aff.], Ex. 14 ¶ 12 [A. Carbajal Aff.], Ex. 37 at 2 [Carbajal Dep.].) Even assuming Plaintiff's children's vague testimony about "people" harassing them in Mexico could be read as alleging Mr. McIntosh — or someone else associated with Defendant's investigation — committed these acts, I find such testimony insufficient to demonstrate a triable issue of fact as to whether Defendant acted unreasonably in denying or delaying Plaintiff's claim. As is true of Plaintiff's own testimony, Plaintiff's children's affidavits provide no indication that Mr. McIntosh's — or anyone else's — alleged threats had any affect upon Defendant's decision to deny or delay coverage. For instance, neither Plaintiff nor her children claim these threats caused them to provide false statement or abandon Plaintiff's claim. Accordingly, while such testimony might demonstrate a disputed question of fact as to whether Mr. McIntosh or someone else harassed Plaintiff and her children, it demonstrates no disputed question of fact as to whether Defendant acted unreasonably in denying or delaying coverage as a result of this alleged harassment. Moreover, even assuming the mere harassment of witnesses might somehow show Defendant acted unreasonably in denying or delaying coverage even absent evidence of a causal connection between this harassment and the denial or delay, Plaintiff has adduced no evidence

that Defendant knew of or should have known of about the alleged harassment, and thus whether it acted with knowledge of or reckless disregard of its unreasonableness in denying or delaying coverage following such harassment. More specifically, no evidence outside of these three witnesses' own testimony corroborates that such harassment occurred, and none suggests such harassment was ever communicated to Defendant. Similarly, no evidence suggests Mr. McIntosh had a history of harassment from which a jury might infer Defendant's reckless disregard of the unreasonableness of hiring him for its investigation. Accordingly, at a minimum, I find Plaintiff cannot prove the second element of her bad faith breach claim because she cannot prove Defendant acted "with knowledge of or reckless disregard of its unreasonableness" in denying or delaying Plaintiff's claim following Mr. McIntosh's alleged harassment of herself and her children. *TAF, L.L.C.*, 549 F. Supp. at 1289.

Similarly, I find Mr. De Anda's alleged harassment of Dr. Avila-Mora insufficient to demonstrate a triable issue of fact as to Defendant's bad faith. Plaintiff has adduced no evidence that Dr. Avila-Mora provided any false information as a result of Mr. De Anda's alleged threats, and I accordingly find no disputed issue of fact to whether Defendant acted unreasonably in denying or delaying coverage as a result of this claimed harassment. Likewise, Plaintiff has adduced no evidence that Defendant was or should have been aware of Mr. De Anda's alleged actions, and the only evidence Mr. DeAnda was even working for Mr. McIntosh — and that Defendant may or should have been aware of this fact — is a single ICS invoice to Defendant listing Mr. De Anda as a "source." (Pl.'s Resp., Ex. 23 at 2 [12/1/04 Invoice].) Such evidence falls far short of suggesting Defendant acted "with knowledge of or reckless disregard of its

unreasonableness" in denying or delaying Plaintiff's claim following Mr. De Anda's alleged

harassment of Dr. Avila-Mora because it gives no indication Defendant either knew of or should

have known of Mr. De Anda's alleged actions. *TAF, L.L.C.*, 549 F. Supp. at 1289.

### d. Defendant's Refusal to Pay Plaintiff's Insurance Claim in Light of the Evidence Suggesting Mr. Carbajal Is Deceased

Plaintiff next argues Defendant acted in bad faith by refusing to pay her claim in light of

the evidence suggesting Mr. Carbajal is deceased. (Pl.'s Resp. at 21–22.) Specifically, Plaintiff

lists ten discrete facts purporting to prove Mr. Carbajal is deceased. (*Id.*) Nonetheless, exclusive

of those facts premised upon evidence I have already found inadmissible, Plaintiff's remaining

supporting evidence of Mr. Carbajal's death are: (1) the two Mexican death certificates; (2) the

two identical affidavits from Plaintiff's children reciting that they saw their father dead; and (3)

the pictures of an individual in a casket, various individuals crying over the casket, and various

individuals standing around what appears to be a cemetery and grave site. (*See id.*, Ex. 9

[Photographs], Ex. 10 [Death Certificates], Ex. 13 [V. Carbajal Aff.]; Ex. 14 [A. Carbajal Aff.].)

Plaintiff also claims to invokes her own deposition testimony attesting to Mr. Carbajal's death,

but the deposition page she cites for this testimony actually discusses her interview with Mr.

McIntosh. (*See id.*, Ex. 37 [Carbajal Dep.].) Likewise, Plaintiff claims to invoke "forensic

evidence that the casket and body were robbed from the grave," but Mr. Pimentel's exhumation

report she cites for this evidence merely recites that the exhumation found "several shards of

glass which . . . could be from the viewing window of a coffin," and "some pieces of aluminum

foil and other materials which may have come from a coffin." (*Id.*, Ex. 5 at 4 [Pimentel

Report].)  For the following reasons, I find such evidence insufficient to raise a triable issue of

fact as to whether Defendant acted unreasonably in light of its statutory duty to "effectuate

prompt, fair, and equitable settlement of claims in which liability has become reasonably clear."

Colo. Rev. Stat. § 10–3–1104(h)(1)(h)(VI) (2008).

As noted above, the reasonableness of an insurer's conduct in denying or delaying a

claim is evaluated "under the circumstances that existed at the time," and I accordingly assess

each of the above-cited facts in the context of the other information available to Defendant when

it denied or delayed Plaintiff's claim.  *Anderson*, 416 F.3d at 1147–48.

In August 2003, when Plaintiff first submitted her claim, Defendant stated it would

undertake a routine investigation and verify the facts concerning death because Mr. Carbajal had

died within the two-year contestable period, and because the death had occurred outside the

United States.  (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 6.)  After Plaintiff submitted the

above-described series of photographs and copies of two Mexican death certificates, Defendant

again advised her that it would conduct an investigation because the death occurred in a foreign

county, and because Plaintiff's policy was still contestable.  (Def.'s Br., SOF ¶ 8; *admitted at*

Pl.'s Resp., RSOF ¶ 8.)  In her instant briefing, Plaintiff acknowledges that "[her] life insurance

claim, like many foreign death claims, should have been investigated," and admits no reasonable

inferences of bad faith may be drawn from "[Defendant's] initial decision to investigate [Mr.

Carbajal's] death by using an American investigator in Mexico."  (*Id.* at 19, 21.)  Accordingly, I

find no triable issue of fact as to whether Defendant acted in bad faith by initially refusing to pay

Plaintiff's claim without first conducting an investigation, even in light of the two Mexican death certificates and series of photographs Plaintiff had submitted.

According to Mr. Rakoczy's unrefuted affidavit testimony, Defendant determined through its subsequent investigation that Mr. Carbajal had applied for a total of 1.9 million in life insurance coverage from different companies and had failed to disclose the existence of some outstanding policies on at least some of his applications. (Def.'s Br., Ex. A ¶ 15 [Rakoczy Aff.]; Def.'s Br., SOF ¶ 12–13; *admitted at* Pl.'s Resp., RSOF ¶ 12–13.) The parties agree that, throughout the course of his investigation, Mr. McIntosh reported various suspicious findings to Defendant, including that: (1) Mr. Carbajal's casket had been purchased and transported in an unusual fashion; (2) in addition to purchasing a casket, Plaintiff had obtained a cremation permit and signed a receipt for cremated remains; (3) the two public death certificates bear two different addresses for the location of Mr. Carbajal's death; (4) one of the alleged witnesses to Mr. Carbajal's death could not be located, and the other refused to be interviewed, and (5) Mr. Carbajal's grave was reportedly disturbed in October 2003. (*See id.*, SOF ¶ 19; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 19.) Because: (1) such facts cast further doubt upon whether Mr. Carbajal was deceased, (2) Plaintiff acknowledges that the initial investigation was warranted, and (3) no intervening evidence suggests Mr. Carbajal was dead, I find no triable issue of fact as to whether Defendant's decision, in August 2004, to deny Plaintiff's claim was unreasonable in light of its duty to effectuate prompt settlement of claims once liability had become reasonably clear.

Finally, between October 2004 and Plaintiff's filing of the instant lawsuit in May 2006, Defendant worked through its Mexican counsel to secure approval for the exhumation of Mr. Carbajal's grave. Neither party has pointed to any evidence emerging from this period probative of whether Mr. Carbajal was alive or dead. In November 2006, however, Plaintiff's counsel obtained affidavits from Plaintiff's two children stating they had seen their father dead on July 15, 2003. (Pl.'s Resp., Ex.13 ¶¶ 5–8 [V. Carbajal Aff.].Ex. 14 ¶¶ 5–8 [A. Carbajal Aff.].) Although it is unclear when such affidavits were provided to Defendant, I find that, even assuming they were provided to Defendant before Defendant had uncovered additional suspicious evidence through discovery, the mere provision of these affidavits raises no triable issue of fact as to whether its continued refusal to pay Plaintiff's claim after November 2006 was unreasonable in light of Mr. McIntosh's findings. Likewise, I find the mere discovery of glass shards and aluminum foil in Mr. Carbajal's grave in August 2007 insufficient to raise a triable issue of fact as to the unreasonableness of Defendant's decision to again deny coverage in January 2008.

In sum, taken in context of the various "circumstances that existed at the time," I find Plaintiff's proffered evidence insufficient to raise a triable issue of fact as to whether Defendant acted unreasonably in denying coverage in light of its statutory duty to "effectuate prompt, fair, and equitable settlement of claims in which liability has become reasonably clear." Colo. Rev. Stat. § 10–3–1104(h)(1)(h)(VI) (2008).

###### e. *Defendant's Delay In Exhuming Mr. Carbajal's Grave*

Lastly, Plaintiff argues Defendant's bad faith is demonstrated by the time lag between its proposed exhumation of Mr. Carbajal's grave in October 2004, and the actual exhumation of this grave in August 2007. (Pl.'s Resp. at 20.) Such a delay, according to Plaintiff, shows Defendant "really [did not] want[] the exhumation to occur." (*Id*.) More specifically, Plaintiff suggests a reasonable jury could infer Defendant's bad faith from both the mere fact of this delay, and from the fact of Defendant's false representation to this court that exhumation papers had been filed in the spring of 2006. (*Id.* at 20–21.) For the following reasons, I disagree.

When Defendant proposed the exhumation of Mr. Carbajal's grave in October 2004, it had already denied Plaintiff's claim on the basis of Mr. McIntosh's investigative findings. (*See* Def.'s Br., Ex. Z [8/19/04 Denial Letter].) As I determined above, no triable issue of fact exists as to whether this August 2004 denial was unreasonable and thus suggestive of bad faith. Accordingly, I find Defendant's October 2004 offer to reverse its decision if exhumation proved Mr. Carbajal to be dead to be merely gratuitous, and any subsequent delay in carrying out this offer insufficient to demonstrate a triable issue of fact as to whether in "*denying* . . . [Plaintiff's] claim, [Defendant] acted: (1) unreasonably and (2) with knowledge of or reckless disregard of its unreasonableness." *TAF, L.L.C.*, 549 F. Supp. at 1289 (emphasis added). Alternatively, even assuming a delay in a gratuitous exhumation could demonstrate bad faith after a claim had reasonably been denied, I find no triable issue of fact as to whether the three-year delay in the instant case suggests Defendant acted unreasonably and with knowledge of, or reckless disregard for, its unreasonableness. Defendant proffers undisputed affidavit testimony describing its

difficulty in obtaining permission to exhume the grave site in Mexico, representing that "[o]btaining the requisite approval from Mexican authorities for an exhumation was not easily or quickly accomplished." (Def.'s Br., Ex. A ¶ 27 [Rakoczy Aff.].) Plaintiff, by contrast, proffers no evidence contradicting such testimony, instead merely speculating that the three-year delay reflects deliberate procrastination. (Pl.'s Resp. at 20–21.) Speculation does not constitute admissible evidence, and I accordingly find Plaintiff has proffered no evidence suggesting that, in failing to effectuate exhumation of Mr. Carbajal's grave for three years, Defendant acted unreasonably, and with knowledge of, or reckless disregard for, its unreasonableness. *See Celotex*, 477 U.S. at 324 (requiring nonmovant to designate specific *facts* demonstrating a genuine issue for trial).

Similarly, I find Plaintiff's suggestion that Defendant falsely represented that exhumation papers had been filed in the spring of 2006 to this court to be an attempt to relitigate an absurd semantical dispute over whether Defendant's Mexican counsel's informal submission of exhumation paper to a Mexican federal district attorney in the spring of 2006 actually constituted "filing" of these papers as Defendant represented to Magistrate Judge Boyd N. Boland. The magistrate judge found Plaintiff's argument in this regard "altogether lacking in merit" in relation to Plaintiff's motion for sanctions, and I agree. (*See* Order at 11 [filed July 2, 2007].) Moreover, I find Defendant's counsel's alleged misrepresentations to this court utterly irrelevant to the question whether in "denying or delaying [Plaintiff's] claim, [Defendant] acted: (1) unreasonably and (2) with knowledge of or reckless disregard of its unreasonableness," *TAF, L.L.C.*, 549 F. Supp. at 128, and alternatively note that, even assuming such a misrepresentations

might be relevant, Defendant's Mexican counsel has stated that the custom in Mexico is for lawyers to informally get together with prosecutors to discuss matters before filing a formal complaint, (*see* Def.'s Strike Reply Ex. A-15 at 9 [Ramirez Dep.]), and Plaintiff proffers no evidence disputing this testimony. Accordingly, even assuming Defendant's counsel's allegedly false representation regarding the "filing" of exhumation papers might somehow suggest unreasonableness in Defendant's denial or delay of Plaintiff's claim, I find that no evidence suggests this misrepresentation was made with knowledge of, or reckless disregard for, its unreasonableness.

Based on the foregoing, I find none of Defendant's actions in investigating or denying Plaintiff's claim either individually or cumulatively demonstrate a triable issue of fact as to its bad faith breach of insurance contract.

### 3.    Conclusion

Based on the foregoing it is therefore ORDERED that:

1.    DEFENDANT'S motion for partial summary judgment on Plaintiff's bad faith breach of insurance contract claim (#143) is GRANTED; and

2.    DEFENDANT'S motion to strike certain exhibits from Plaintiff's response to Defendant's motion for partial summary judgment (#161) is GRANTED in part and DENIED in part as more fully detailed above.

The court will hold a Final Pretrial Conference commencing at 3:15 o'clock p.m. on September 17, 2008, in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado. In preparing for and participating in the conference, the parties

and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord.wpd These specific web addresses should be used to insure that the proper format is observed.

Dated this 20th day of August 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge